People v Garrand (2020 NY Slip Op 07432)





People v Garrand


2020 NY Slip Op 07432


Decided on December 10, 2020


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: December 10, 2020

109720

[*1]The People of the State of New York, Respondent,
v
Daniel Garrand, Appellant.

Calendar Date: October 21, 2020

Before: Egan Jr., J.P., Mulvey, Aarons, Pritzker and Colangelo, JJ.


Stephen W. Herrick, Public Defender, Albany (James A. Bartosik Jr. of counsel), for appellant.
P. David Soares, District Attorney, Albany (Christopher D. Horn of counsel), for respondent.



Pritzker, J.
Appeal from a judgment of the County Court of Albany County (Lynch, J.), rendered August 18, 2017, upon a verdict convicting defendant of the crime of criminal sexual act in the first degree.
Defendant was charged by indictment with two counts of criminal sexual act in the first degree and one count of assault in the second degree stemming from allegations that he engaged in forcible anal and oral sexual conduct with the victim, an 81-year-old woman. Following a jury trial, defendant was convicted of one count of criminal sexual act in the first degree for the allegations relating to oral sexual conduct and was otherwise acquitted of the remaining counts. Defendant was sentenced to a prison term of eight years, to be followed by 10 years of postrelease supervision. Defendant appeals.
Defendant contends that the verdict is not supported by legally sufficient evidence and is against the weight of the evidence, specifically taking issue with the element of forcible compulsion. "Initially, as defendant's motion for a trial order of dismissal at the close of proof was not directed at the specific argument he raises on appeal, his legal sufficiency claim is unpreserved" (People v Porter, 184 AD3d 1014, 1014 [2020] [internal quotation marks, brackets and citations omitted], lv denied 35 NY3d 1069 [2020]). Nevertheless, in the course of reviewing defendant's challenge to the weight of the evidence, "[this Court] necessarily evaluate[s] whether all elements of the charged crimes were proven beyond a reasonable doubt" (People v Stover, 178 AD3d 1138, 1139 n 1 [2019], lv denied 34 NY3d 1163 [2020]; see People v Saunders, 176 AD3d 1384, 1385 [2019], lv denied 35 NY3d 973 [2020]). "A weight of the evidence review requires this Court to first determine whether, based on all the credible evidence, a different finding would not have been unreasonable. Where a different finding would not have been unreasonable, this Court must weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine if the verdict is supported by the weight of the evidence" (People v Stover, 178 AD3d at 1139 [internal quotation marks, brackets and citations omitted]; accord People v Forney, 183 AD3d 1113, 1113-1114 [2020], lv denied 35 NY3d 1065 [2020]). As relevant here, "[a] person is guilty of criminal sexual act in the first degree when he or she engages in oral sexual conduct . . . with another person by forcible compulsion" (Penal Law § 130.50 [1]). Within the context of sex offenses, forcible compulsion "means to compel by either use of physical force; or a threat, express or implied, which places [the victim] in fear of immediate death or physical injury" (Penal Law § 130.00 [8] [a], [b]).
The victim testified that she and defendant had previously had a consensual sexual relationship, but they had not had sexual intercourse for some time. The victim testified that when defendant [*2]came to her apartment on the day of the incident, he seemed agitated. Once defendant came inside, the victim directed him to take off the "silly looking pants" he was wearing and then instructed him to get some sleep. The victim testified that defendant began to cry saying, "I can't do this anymore," which prompted her to give him .5 milligrams of Lorazepam,[FN1] which she is prescribed to treat her anxiety, and to rub his back while he laid in her bed. The victim testified that she left defendant in the bedroom and was sitting on the sofa in the living room when defendant walked over and straddled her, such that she was unable to move despite trying. Defendant's penis was erect and visibly protruding from the waistband of the orange mesh underwear he was wearing. The victim testified that defendant rubbed his penis across her face and on her lips while telling her that the liquid on it was semen and that she told him to "[s]top it." Defendant also unsuccessfully attempted to push a hairbrush under the victim's shorts into her vaginal area. When the victim attempted to rub the semen off of her lips, defendant slapped her twice. The victim explained that she had a nail file, which she looked down at, but told herself not to try anything because he would kill her. Defendant then took the nail file out of her hand and dragged her off the couch and across the rug, at which point he took off her underwear and shorts. The victim testified that defendant attempted to penetrate her vaginally and that she yelled out twice for help. Defendant stopped, but, after the victim returned to the sofa, he proceeded to drag her across the floor again, this time attempting to penetrate the victim anally. The victim yelled out very loudly. Defendant then got up and, shortly thereafter, picked up a heavy crystal bowl and said, "[Y]ou could probably hurt somebody with this." This comment led the victim to believe that defendant was either going to kill or seriously injure her, so she left her apartment and called the police.
The victim testified that, after going to the police station to give a statement, she went to the hospital, where she was examined by a sexual assault nurse examiner. The victim testified to various injuries that she sustained during the incident, including an injured spine from being dragged off of the couch, brush burns on her elbows from the rug, damaged upper dentures and an injury on the left side of her jaw from defendant grabbing her face. Sade McKenzie, a resident physician at the hospital, testified that she treated the victim on the day of the incident. Her testimony regarding the victim's description of what had occurred that day was in line with the victim's testimony at trial. McKenzie testified that she observed injuries on the victim that were consistent with being dragged or held by those body parts. Testimony from two forensic scientists established that prostate-specific antigen, a component of seminal fluid, was detected [*3]on vulvar and vaginal swabs collected from the victim and that a DNA sample taken from a cutting of the victim's underwear matched the DNA profile of defendant.[FN2]
Multiple police officers also testified, explaining that when they arrived at the victim's apartment the day of the incident, defendant was naked and acting "very erratic" and "irrational," including repeatedly touching his genitals. Defendant was eventually handcuffed and brought to the police station to be interviewed. The video recording of defendant's interview was published to the jury and portions were played at trial. During the interview, defendant admitted to getting on top of the victim and "straddl[ing] her" while wearing mesh underwear. When asked if there was anything on his penis when it was near the victim's face, defendant confirmed that it was semen and said that he had told the victim, "[L]et me get this all over so when the police come, they can see the DNA." In addition to putting his penis near the victim's mouth, defendant admitted to pulling off her pants, putting his hand on her mouth when she asked him to stop and pulling her off the couch. When asked if he was attempting to help the victim sexually, defendant stated that his conduct was for the purpose of showing her that "sex could be used as a weapon" and to ensure her safety if defendant was not around. To that end, defendant claimed that he pulled the victim off the couch to test her strength and that he was more verbally harsh than he was physically. In alleging that he was not overly rough with the victim, he stated that she "only had some marks on her and stuff like that."
Defendant also testified at trial, explaining that he met the victim in 2011, that they began having an intimate relationship thereafter and that they even lived together. Defendant testified that he moved out of the victim's residence approximately two months before the day of the incident, but still went to visit every day. Defendant testified that on the morning of the incident, he "wasn't all together" and explained that he had been arrested earlier that morning. Defendant testified that the victim let him into her apartment and that he cried to the victim for about an hour and then went into the bedroom, where the victim talked to him while he cried for another hour. He testified that the victim told him to take off his clothes, including his "silly pants," and get into her bed, at which point she rubbed his back to help his anxiety and gave him two aspirin and four Lorazepam. Defendant testified that he and the victim laid together in the bed and that she said he could "thank her later." At this point, defendant's testimony began to diverge from that of the victim, as well as from his own statements during the police interview. Defendant claimed that the victim initiated the oral sex, which lasted less than a minute because he "wasn't really into it." Defendant testified that this seemed to make the victim "really [*4]angry" and the two began to argue. Defendant explained that he attempted to pacify the victim, but that his attempts were fruitless, and that the victim grabbed her keys and stormed out of the apartment saying, "[E]verything is a . . . joke with you." Defendant claimed that he went back to the bedroom to lie down because he was dizzy and his mouth was dry from the medication. Defendant testified that he was in the victim's bed, under the sheets, when the police entered the bedroom, and he did not know why they were there. During his testimony, defendant specifically denied ever threatening the victim while holding her crystal bowl, dragging her on the floor or forcing his genitals on her.
Although it would not have been unreasonable for the jury to have resolved the credibility issues differently in this case and to have reached the opposite conclusion, any inconsistencies "neither undermined the victim's testimony in any meaningful respect nor rendered her testimony incredible as a matter of law" (People v Butkiewicz, 175 AD3d 792, 795 [2019] [internal quotations marks and citation omitted], lv denied 34 NY3d 1076 [2019]; see People v St. Ives, 145 AD3d 1185, 1187 [2016], lv denied 29 NY3d 1036 [2017]). As to the element of forcible compulsion, "[t]he existence of an implied threat is established by a subjective inquiry into what a victim feared a defendant might have done if he or she did not comply" (People v Blackman, 90 AD3d 1304, 1306 [2011] [internal quotation marks and citations omitted], lv denied 19 NY3d 971 [2012]; see People v Melendez, 138 AD3d 1159, 1160 [2016], lv denied 27 NY3d 1136 [2016]). To that end, the victim testified that, while defendant engaged in oral sexual conduct with her, he was straddling her so that she was unable to move, despite trying. When she attempted to wipe his semen off of her mouth, he slapped her. Moreover, the victim also testified that she did not try to fight back, despite having a nail file, because she was afraid that defendant would kill her. She also testified that defendant was a body builder and significantly stronger than her. As such, the testimony at trial was adequate to establish the element of forcible compulsion (see People v Melendez, 138 AD3d at 1160; People v Blackman, 90 AD3d at 1306). Thus, according deference to the jury's credibility assessments and viewing the evidence in a neutral light, the verdict is supported by the weight of the evidence (see People v Butkiewicz, 175 AD3d at 795; People v McClenos, 172 AD3d 1638, 1640 [2019], lv denied 33 NY3d 1107 [2019]).
Defendant contends that County Court erred in denying his motion to suppress statements made to the police because his Miranda waiver was not knowing, voluntary and intelligent due to his mental condition at the time. We disagree. On a motion to suppress, "the People [bear] the burden of proving beyond a reasonable doubt that [the] defendant's statement to police was voluntarily given, including that any custodial [*5]interrogation was preceded by the administration and [the] defendant's knowing waiver of his [or her] Miranda rights" (People v Steigler, 152 AD3d 1083, 1083 [2017] [internal quotation marks and citations omitted], lv denied 30 NY3d 983 [2017]; see People v Love, 85 AD2d 799, 799 [1981], affd 57 NY2d 998 [1982]). "Determining whether a statement is voluntary is a factual issue governed by the totality of the circumstances[,] and the credibility assessments of the suppression court in making that determination are entitled to deference" (People v Mattis, 108 AD3d 872, 874 [2013] [internal quotation marks, brackets and citations omitted], lv denied 22 NY3d 957 [2013]; accord People v Steigler, 152 AD3d at 1083). Once the People have met their burden, "the burden of persuasion shift[s] to the defendant to adduce evidence supporting his [or her] contention that he [or she] did not comprehend his [or her] rights" (People v Zephir, 226 AD2d 408, 408 [1996], lv denied 88 NY2d 1072 [1996]).
Testimony at the hearing and a video of the interview, which was admitted into evidence, established that defendant was administered his Miranda rights prior to being interviewed by two detectives. The detective reading defendant his rights paused after each right to ask defendant if he understood what had just been said, which defendant indicated that he did. The detective then, after reading all of the rights, again asked defendant if he understood "each of these rights he read to him," expressing that "[he] wanted to make sure he under[stood] them." Although the video and testimony established that defendant engaged in some concerning behavior before and during the interview,[FN3] defendant was specifically questioned prior to beginning the interview as to whether he was under the influence of any drugs or alcohol or if he "suffered from any mental illnesses." Defendant responded that he did not. One of the detectives also asked defendant if he was usually "agitated" or if something had happened that day that made him agitated, to which defendant replied "kinda, yeah." Throughout the interview, defendant remained calm while speaking with the detectives and answered their questions in a manner that revealed that he understood the questions being posed by the detectives. Inasmuch as "there is a strong presumption that a person is sane" (People v Love, 85 AD2d at 799), we find that, based on the foregoing, the People met their burden of establishing that defendant knowingly, voluntarily and intelligently waived his Miranda rights, thus shifting the burden to defendant (see People v Zephir, 226 AD2d at 408). However, defendant did not testify nor offer any evidence, expert or otherwise, to support his contention that he did not comprehend his rights. Thus, defendant failed to meet his burden of persuasion and County Court properly denied his motion to suppress his statements (see People v Billington, 163 AD2d 911, 911 [1990], lv denied 76 NY2d 891 [1990]; People [*6]v Zephir, 226 AD2d at 408; compare People v White, 85 AD2d 787, 787-788 [1981]).
Defendant also asserts that County Court erred in denying his request to redact the victim's medical examination records, specifically, a three-page, preprinted form that gives discharge and follow-up instructions to victims of sexual assault and which was provided to the victim. Defendant argues that it was prejudicial for the jury to view this form because it concludes that the victim was sexually assaulted, which was a determination for the jury to make, and provided "medical definitions" for sexual abuse that are not found in the Penal Law. We are unpersuaded by this argument. The court made clear to the jurors, when providing its final instructions, that "[y]ou and you alone are the judges of the facts and you and you alone are responsible for deciding whether the defendant is guilty or not guilty." The jury's adherence to the court's instructions is evident in its decision to acquit defendant of the charge alleging anal sexual conduct, despite McKenzie's "diagnosis" and her testimony that the victim reported to her that defendant anally penetrated the victim with his penis. Thus, given that the discharge form related to "diagnosis, prognosis or treatment" of the victim (People v Wright, 81 AD3d 1161, 1164 [2011], lv denied 17 NY3d 803 [2011]), it was properly admitted into evidence (see People v Ortega, 15 NY3d 610, 617 [2010]).
Lastly, defendant contends that County Court erred in denying his request for the lesser included charge of sexual misconduct (see Penal Law § 130.30). As "the elements of the two offenses are identical, there is no reasonable view of the evidence which would support a finding that the defendant committed such lesser offense but did not commit the greater" (People v Sparman, 193 AD2d 1076, 1076 [1993] [internal quotation marks and citation omitted]; see People v Williams, 40 AD3d 1364, 1367 [2007], lv denied 9 NY3d 927 [2007]). As such, the request was properly denied.
Egan Jr., J.P., Mulvey, Aarons and Colangelo, JJ., concur.
ORDERED that the judgment is affirmed.



Footnotes

Footnote 1: Later in the trial a physician testified that Lorazepam causes drowsiness.

Footnote 2: One of the forensic scientists explained that the DNA match indicates that defendant and his biological relatives may be included as possible contributors of DNA to this profile. The forensic scientist also explained that DNA can remain on an item for a long time, depending on how the item was preserved.

Footnote 3: This behavior includes lying on the floor in the interview room in a fetal position while waiting for detectives and, a few times during the interview, making irrational statements.