People v Davis (2021 NY Slip Op 04391)





People v Davis


2021 NY Slip Op 04391


Decided on July 15, 2021


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered:July 15, 2021

110859
[*1]The People of the State of New York, Respondent,
v
Oscar Davis, Appellant.

Calendar Date:May 26, 2021

Before:Egan Jr., J.P., Aarons, Pritzker, Reynolds Fitzgerald and Colangelo, JJ.

Cliff Gordon, Monticello, for appellant.
Meagan K. Galligan, District Attorney, Monticello (Kristin L. Hackett of counsel), for respondent.



Pritzker, J.
Appeal from a judgment of the County Court of Sullivan County (LaBuda, J.), rendered October 5, 2018, convicting defendant following a nonjury trial of the crimes of criminal sexual act in the second degree, rape in the second degree and endangering the welfare of a child.
Defendant was charged by indictment with criminal sexual act in the second degree, rape in the second degree and endangering the welfare of a child stemming from allegations that, on July 26, 2015, defendant engaged in sexual contact and intercourse with a 14-year-old victim. After a nonjury trial, County Court convicted defendant as charged and sentenced him to a one-year jail term for his conviction of endangering the welfare of a child and 10 years of probation for his remaining convictions. Following receipt of a letter from the Probation Department advising that the original sentence for his conviction of endangering the welfare of a child was illegal, defendant was thereafter resentenced, upon consent of the parties, to a six-month jail term for this conviction. Defendant appeals.
At issue on appeal are two sets of statements that defendant moved to suppress. County Court, after a Huntley hearing, denied defendant's motion. The first set of statements were made by defendant to law enforcement when they responded to his residence based upon a reported disturbance involving the victim's family. "A defendant is subjected to custodial interrogation, triggering his or her rights under Miranda, when a reasonable person innocent of any wrongdoing would have believed that he or she was not free to leave. Factors to be taken into account in this analysis include the location, length and atmosphere of the questioning, whether police significantly restricted the defendant's freedom of action, the degree of the defendant's cooperation, and whether the questioning was accusatory or investigatory. A court's determination that a defendant was not in custody is accorded great weight and will not be disturbed unless clearly erroneous" (People v Fragassi, 178 AD3d 1153, 1156 [2019] [internal quotation marks, brackets and citations omitted], lv denied 34 NY3d 1128 [2020]; see People v Yukl, 25 NY2d 585, 589 [1969], cert denied 400 US 851 [1970]; People v McCabe, 182 AD3d 772, 774 [2020]).
At the suppression hearing, Richard Morgan, a detective with the Sullivan County Sherriff's Office, testified that, on the afternoon of July 30, 2015, while on patrol, he was flagged down by a civilian who requested assistance because "some of his family [members were] confronting someone . . . and thought it was going to turn ugly." Morgan subsequently arrived alone to what he later learned to be defendant's home and observed three or four people in front of the house yelling at defendant. Morgan then separated the parties, "figured out who was who" and "tried to get everybody's names [and] date[s] of birth." He then discussed with the people who were arguing with defendant the nature of [*2]the dispute and thereafter went over to defendant, who was sitting on the porch with his mother, to get their names and dates of birth, at which point defendant started to cry. Morgan, thinking that defendant may have been scared, asked why defendant was crying. He also asked defendant if he had previously told a state trooper "the truth," to which defendant responded "no," followed by "that girl put her mouth on my penis." Morgan attested to not threatening or coercing defendant into speaking with him. He further testified to not placing defendant into custody, handcuffing him or having his gun out during the conversation. Morgan confirmed that he did not give defendant Miranda warnings. "Under these circumstances, we conclude that a reasonable person innocent of any wrongdoing would have believed that he or she was free to leave," and, therefore, County Court did not err in denying defendant's motion to suppress these statements (People v Pittman, 178 AD3d 1136, 1137 [2019] [citations omitted], lv denied 34 NY3d 1162 [2020]; see People v Morris, 173 AD3d 1220, 1222 [2019], lv denied 34 NY3d 953 [2019]; People v Clarke, 157 AD3d 616, 616 [2018], lv denied 31 NY3d 1080 [2018]).
We turn now to defendant's second set of statements, which were both oral and written, made after defendant was in custody. "The People [bear] the burden of proving the voluntariness of [the] defendant's statements beyond a reasonable doubt, including that any custodial interrogation was preceded by the administration and [the] defendant's knowing waiver of his [or her] Miranda rights. Determining whether a statement is voluntary is a factual issue governed by the totality of the circumstances and the credibility assessments of the suppression court in making that determination are entitled to deference" (People v Butcher, 192 AD3d 1196, 1197 [2021] [internal quotation marks and citations omitted], lv denied 36 NY3d 1118 [2021]; see People v Garrand, 189 AD3d 1763, 1767-1768 [2020], lv denied 36 NY3d 1120 [2021]). "In dealing with a person with intellectual disabilities, close scrutiny must be made of the circumstances of the asserted waiver of his or her Miranda rights" (People v Stocum, 143 AD3d 1160, 1161 [2016] [internal quotation marks and citations omitted]; see People v Comfort, 6 AD3d 871, 873 [2004]).
Jeffrey Dalton, an investigator with the State Police, testified that, on July 30, 2015, he was assigned to investigate allegations of a sexual nature against defendant. According to Dalton, on that afternoon, defendant was transported by state troopers to an interview room at the State Police barracks where Dalton and another investigator awaited him.[FN1] Prior to speaking with defendant, Dalton advised him of his Miranda warnings by reading them from a preprinted Miranda card. Defendant then indicated that he understood his Miranda rights and that he was willing to speak with Dalton. Thereafter, defendant stated that he knew the victim prior to the incident[*3], was aware of her age, had intercourse with the victim and "knew it was wrong." During this conversation, defendant drew the room where the alleged crime occurred. Dalton further testified that, in defendant's presence, he typed out a statement and that Miranda warnings were printed on the top of the statement. Dalton reviewed the Miranda warnings with defendant, who indicated that he understood by initialing each warning. Dalton and defendant then reviewed the statement and defendant signed it. Dalton further attested to also looking at defendant's phone during that interrogation after defendant signed a voluntary consent form. Regarding the interrogation as a whole, Dalton attested to neither threatening nor coercing defendant into speaking with him and that defendant never asked to stop the interrogation, to leave or for an attorney. On cross-examination, Dalton testified that he was not aware if defendant "officially" had a learning disability. When Dalton asked defendant to sign the written statement toward the end of the interrogation, defendant asked him what was going to happen to him when he appeared before a judge and whether he would "have a lawyer there." Regarding the latter, Dalton responded that a lawyer would be assigned if he could not afford one.
Defendant called his mother, who testified that defendant has a "speech impairment" and "is limited on understanding reading, which means that certain instructions, anything conversation, he doesn't understand." According to defendant's mother, on the afternoon of July 30, 2015, when defendant left with police officers, the mother told the officers that defendant "had a learning disability." She subsequently told the officers "two to three times" that defendant "needed a lawyer," and that she "didn't want him to be questioned anymore until he got a lawyer." Defendant's mother also testified that defendant requested counsel "two more times before going into the [police] car." On cross-examination, defendant's mother testified that defendant graduated high school "[w]ith an IEP diploma" and can read. On rebuttal, Richard Walter, an investigator with the State Police who responded to defendant's residence on July 30, 2015, testified that, upon arrival thereto, he spoke to defendant and then transported him, without using handcuffs, to the State Police barracks. Walter additionally testified that defendant did not request counsel while at his residence or en route to the barracks, nor did anyone request counsel on his behalf.
Regarding this second set of statements, the record reveals that Dalton properly provided defendant with Miranda warnings and defendant verbally assented to understanding his rights before any questioning began (see People v Fiorino, 130 AD3d 1376, 1379 [2015], lv denied 26 NY3d 1087 [2015]; People v Perkins, 124 AD3d 1062, 1063 [2015], lvs denied 26 NY3d 928, 933 [2015]; People v Jaeger, 96 AD3d 1172, 1173 [2012], lv denied 19 NY3d 997 [2012]). The [*4]record lacks any support for defendant's contention that, because of his alleged learning disability, defendant was unable to understand his Miranda rights (see People v Stocum, 143 AD3d at 1162; compare People v Cleverin, 140 AD3d 1080, 1082-1083 [2016]), and, in any event, Dalton attested to not knowing "officially" of defendant's learning disability at the time of the interrogation. County Court, which reviewed the recording of the interview, credited Morgan's testimony in this regard. According due deference to that determination and given the totality of the circumstances, we find that defendant was advised of, and validly waived, his Miranda rights (see People v Steigler, 152 AD3d 1083, 1084 [2017], lv denied 30 NY3d 983 [2017]; People v Fiorino, 130 AD3d at 1379-1380; People v Jaeger, 96 AD3d at 1173-1174).
Finally, to the extent that defendant contends that he invoked his right to counsel, we disagree. Although defendant's mother testified that defendant requested an attorney prior to leaving the residence, Walter testified to the contrary and County Court credited Walter's testimony. We accord deference to this credibility determination, which is supported by the record, and, thus, decline to disturb it (see People v Culver, 69 AD3d 976, 977-978 [2010]; People v Twillie, 28 AD3d 1236, 1237 [2006], lv denied 7 NY3d 795 [2006]). Moreover, defendant did not invoke his right to counsel at the State Police barracks. Dalton's testimony reveals that defendant inquired whether he would "have a lawyer there," seemingly referring to court proceedings, which does not constitute an unambiguous and unequivocal request for counsel (see People v Fiorino, 130 AD3d at 1379; People v Hurd, 279 AD2d 892, 892-893 [2001]). Based on the foregoing, County Court properly denied defendant's motion to suppress the contested inculpatory statements.
Egan Jr., J.P., Aarons, Reynolds Fitzgerald and Colangelo, JJ., concur.
ORDERED that the judgment is affirmed.



Footnotes

Footnote 1: A copy of the recording of defendant's interview was admitted into evidence at the hearing.