People v Starnes (2022 NY Slip Op 03764)

People v Starnes

2022 NY Slip Op 03764

Decided on June 9, 2022

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:June 9, 2022

109472
[*1]The People of the State of New York, Respondent,
v
James R. Starnes, Appellant.

Calendar Date:April 27, 2022

Before:Clark, J.P., Pritzker, Colangelo, Ceresia and McShan, JJ.

Paul J. Connolly, Delmar, for appellant.
Michael A. Korchak, District Attorney, Binghamton (Rita M. Basile of counsel), for respondent.

Pritzker, J.
Appeals (1) from a judgment of the County Court of Broome County (Dooley, J.), rendered May 5, 2017, upon a verdict convicting defendant of the crimes of predatory sexual assault against a child, criminal sexual act in the second degree (two counts), sexual abuse in the first degree, rape in the second degree and course of sexual conduct against a child in the second degree, and (2) from an order of said court, entered May 26, 2021, which, among other things, settled the trial transcripts.
In April 2016, three siblings (hereinafter victims A, B and C; collectively referred to as the sibling victims) reported that defendant had sexually abused them. An investigation revealed that one of the sibling victims' friends (hereinafter victim D) had also been sexually abused. Defendant was charged, in two indictments, with predatory sexual assault against a child, two counts of criminal sexual act in the second degree, rape in the second degree, course of sexual conduct against a child in the second degree, two counts of sexual abuse in the first degree and four counts of endangering the welfare of a child. On the day of the trial, the endangering the welfare of a child counts were dismissed. Defendant was found guilty on all remaining counts except for one count of sexual abuse in the first degree pertaining to victim B. Defendant was sentenced to various consecutive and concurrent prison terms, amounting to an aggregate prison term of 30 years to life, to be followed by three years of postrelease supervision. Defendant appealed from the judgment of conviction.
While this appeal was pending, this Court granted defendant's motion for a reconstruction hearing for "the portion of the voir dire proceedings conducted on February 28, 2017" in connection with jury selection (2020 NY Slip Op 72835[U]). As such, this Court held the appeal in abeyance and remitted the matter to County Court for said hearing (id.). Defendant also made a separate motion before County Court to amend the transcripts and settle the record accordingly. After the reconstruction hearing, County Court determined that there was nothing to suggest that anything "untoward" had happened during jury selection. Additionally, the court denied defendant's motion to amend the transcripts and ordered the transcripts certified as correct. Defendant also appeals from the order denying his motion.
Initially, defendant's contention that the evidence is legally insufficient because the victims' testimony was incredible as a matter of law is devoid of merit (see People v Jones, 89 AD3d 1395, 1396 [2011], lv denied 18 NY3d 925 [2012]; People v Smith, 272 AD2d 713, 716 [2000], lv denied 95 NY2d 871 [2000]; see generally People v Hansel, 200 AD3d 1327, 1330 [2021], lv denied 38 NY3d 927 [2022]; People v Van Alphen, 167 AD3d 1076, 1078 [2018], lv denied 32 NY3d 1210 [2019]). Defendant failed to preserve for our review his further arguments challenging the legal sufficiency of the evidence (see [*2]People v Moore, 202 AD3d 1373, 1373 [2022]; People v Harris, 177 AD3d 1199, 1200 [2019], lv denied 35 NY3d 970 [2020]). "Nevertheless, in reviewing whether the verdict is against the weight of the evidence, this Court necessarily must ensure that the People proved each element of the crime beyond a reasonable doubt" (People v Cooper, 196 AD3d 855, 858 [2021] [internal quotation marks and citations omitted], lv denied 37 NY3d 1160 [2022]). "Additionally, where, as here, it would not have been unreasonable for the jury to have reached a different verdict, we must weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine if the verdict is supported by the weight of the evidence" (People v Persen, 185 AD3d 1288, 1289 [2020] [citations omitted], lv denied 36 NY3d 1099 [2021]).
In addition to generally challenging the weight of the evidence, defendant alleges two specific evidentiary deficiencies. One such error is that, as to the top count of predatory sexual assault against a child, there was no evidence of a course of sexual conduct against victim A lasting three months or longer. The other such error is that, as to the one count of sexual abuse in the first degree as to victim A, there was no evidence of forcible compulsion. As relevant here, "[a] person is guilty of predatory sexual assault against a child when, being [18] years old or more, he or she commits the crime of . . . course of sexual conduct against a child in the first degree . . . and the victim is less than [13] years old" (Penal Law § 130.96). "A person is guilty of course of sexual conduct against a child in the first degree when, over a period of time not less than three months in duration[,] . . . he or she, being [18] years old or more, engages in two or more acts of sexual conduct, which include at least one act of sexual intercourse[ or] oral sexual conduct . . ., with a child less than [13] years old" (Penal Law § 130.75 [1] [b]). As to sexual abuse in the first degree, "[a] person is guilty of [such crime] when he or she subjects another person to sexual contact . . . [b]y forcible compulsion" (Penal Law § 130.65 [1]). "Within the context of sex offenses, forcible compulsion 'means to compel by either use of physical force; or a threat, express or implied, which places [the victim] in fear of immediate death or physical injury'" (People v Garrand, 189 AD3d 1763, 1764 [2020] [ellipses omitted], lv denied 36 NY3d 1120 [2021], quoting Penal Law § 130.00 [8] [a], [b]).
Victim A testified that, at the time of trial in March 2017, she was 15 years old and in tenth grade. Prior to April 2016, victim A was living with defendant, her three sisters and occasionally her two older half brothers. The mother of the four daughters (hereinafter the sisters) was not living with them. Victim A detailed her family's history of moving to different apartments, specifically referencing [*3]three apartments, which established points of reference for her testimony, as well as other witnesses' testimony, regarding defendant's abuse. Victim A testified that she would have constant arguments with defendant and that there were times when he would punish her physically, such as by hitting her in the head, grabbing and twisting her wrist and hitting her with a belt. Victim A also saw her sisters punished in this fashion.
Victim A testified that the sexual abuse started when she was in sixth grade, living at the first of the three apartments and asked defendant for a bicycle.[FN1] He said that he would get her one if she "help[ed] him with stuff," which he explained to victim A as touching defendant's private parts and him touching victim A's private parts. Victim A's testimony then focused on the year before she turned 13 in May 2014. She testified that, during that year, she would touch defendant's penis with her hands and mouth and that defendant would usually ejaculate on her or, a few times, into her mouth. Among other sexual contact victim A testified about, she explained that, during the year before she turned 13, defendant engaged in sexual intercourse with her. Victim A testified that also, during the year before she turned 13, defendant subjected her to sexual contact multiple times a week. Victim A explained that the oral sexual conduct continued through the summer of 2014 and, after moving to a new apartment — the second of the three apartments — it continued during the fall of 2014. Victim A also recalled a specific incident that occurred in the fall of 2015, while living in the third of the three apartments. She testified that she was in the bathtub when defendant came into the bathroom, sat on the toilet and opened the shower curtain to look at her. He then reached his hand into the bath and digitally penetrated the victim's vagina, despite her saying no. She testified that she couldn't get out of the tub and away from him because the toilet was right next to the tub.
Victim A testified that defendant was generally able to get and maintain an erection although there were a few times that he was unable to. Victim A explained that she never told anyone what defendant was doing because he told her that no one would believe her, that she would be taken away and separated from her sisters. He also threatened her, saying that he would "hunt [her] down and kill [her] for destroying the family." Notably, victim B testified that she saw defendant and victim A in defendant's bedroom a few times in various states of undress but that she did not tell anyone except for one of her close friends because she did not think that anyone would believe her. Victim C recalled that one time she passed defendant's bedroom in the middle of the night and saw defendant in "a push-up position" over victim A.
Victim D, who was 17 at the time of the trial, testified that, in the summer of 2013, victim D became friends with the sisters and [*4]would occasionally stay at their apartment overnight. One day she went into defendant's bedroom when defendant was at his computer; after victim D sat on the bed, defendant asked her if she wanted to do something and then told her to take her clothes off and lie down. Victim D testified that defendant, who already had his shirt off, then slid his pants down and removed his underwear, got on top of her and put his penis inside her vagina. Victim D recalled that she could not breathe well and told defendant to stop but he kept going for one or two minutes. Defendant stopped when he heard one of the sisters coming. Victim D explained that she did not tell anyone because defendant told her it was a secret and she was not sure how her mother or her mother's boyfriend would react. On cross-examination, victim D testified that she saw one of the sisters at the door before defendant got on top of her but she could not recall which one. Victim A recalled witnessing an incident between defendant and victim D, which she was able to see because of a hole in the doorway to defendant's room. Victim A testified that she saw victim D sitting on a speaker facing defendant with her shirt off. Defendant had his pants and underwear down, although victim A could not see his groin because it was blocked by victim D.
Victim C, who was 11 years old at the time of trial, testified that she would frequently massage defendant's legs and that one time in the winter of 2014, while living at the second apartment,[FN2] defendant asked her to rub his legs and then asked her to lie down. Defendant put his hand under her clothing on her butt and "on the side" on the top part of her body. While he did this, defendant put his other hand under a blanket and moved it in an up and down motion. This happened for three to five minutes. Victim C then told defendant she had to go to the bathroom and waited there until defendant fell asleep. The same thing happened on three other occasions, including while at the third apartment.[FN3] On one of these occasions, victim A called to her and she was able to leave the room. Victim C never told anyone about this because defendant said that if she did, he would "go to jail" and that, when he came out of jail, he would "hurt" and "kill" the sisters. Defendant also threatened to separate them and put them up for adoption. Victim C also testified that defendant would hit her with an open hand or with his belt as punishment. Notably, victim A testified that, while at the third apartment, she recalled seeing victim C with defendant in his bedroom. Defendant put his hand up victim C's shirt while victim C was rubbing defendant's legs. Victim A asked victim C to go clean the living room to get her out of the situation, and said that she would continue rubbing defendant's legs. Victim A testified that defendant frequently had the children give him massages because he had leg problems and that many of her own sexual interactions with defendant [*5]took place after rubbing his legs. Victim B also testified that, while at the third apartment, she saw victim C in defendant's room and saw defendant putting his hand up victim C's shirt.
Victim B also testified about defendant punishing her and the sisters by hitting them with a leather belt, his hands or a flyswatter. She explained that defendant would pull down their pants and hit them and that he would also "dump[] [her] head under [water] and [hold] it there." Victim B also testified that defendant would make the sisters massage his legs and then touch them. On cross-examination, victim B stated that she once saw defendant stab the fourth sister in the back with a fork. Victim B explained that she never told any adult about what happened because defendant "threatened [them]" and said they "would get separated or he would hunt [them] down to the ends of the earth and w[ould] kill [them] if [they] ever told." The sisters' mother (hereinafter the mother) testified that she met defendant when she was 16 years old and he was in his 30s and then began living with defendant when she was 17 years old. She eventually moved out because she and defendant were constantly fighting. The mother initially took the sisters with her but then left them with defendant after two months because defendant told her that he was going to use the fact that she was dating a man who was drinking and doing drugs against her. The mother continued to have an intimate relationship with defendant after they separated, and they engaged in sexual relations once a week when she went to his apartment because defendant told her that, if she did not, she would not be allowed to see the sisters. This relationship continued at both the second and the third apartment and the mother last had sexual relations with defendant in the winter of 2015. Defendant never had trouble performing sexually except for a few times when they were interrupted by the sisters knocking. Defendant would also frequently ask her to massage his legs and she complied. In a recorded police interview, defendant, among other things, denied sexual contact with any of the victims and stated that he caught the sisters in many lies, particularly victims A and B. Defendant also claimed that if he wanted to have sex he would do so with the mother but that he was unable to because he stopped being able to maintain an erection sometime between 2012 and 2014.
For his part, defendant called an individual who was 18 years old at the time of trial and had known defendant when he lived at the first apartment. She described defendant as a "father figure" and averred that he drove her to school. This individual testified that she saw defendant yell at the sisters but never saw him get physical. Nor did she see defendant do anything inappropriate with the sisters. When asked if defendant had ever done anything to her, she stated that "[h]e looked at [her] boobs" once or twice but she had told him to stop and [*6]he complied and that he never looked at her that way again and he never touched her.
Defendant testified that, at the time of trial, he was 51 years old and was unemployed due to a back injury that occurred when he was 26 years old. Defendant testified that the children needed to do chores, including cleaning the floors and walls and doing the dishes. Defendant testified that he would ask the children to give him massages when he was in pain but they did not have to do this. Defendant explained that, around 2009 or 2010, he began to experience sexual dysfunction and had trouble getting or maintaining an erection and that he began treatment for this at some point. Defendant testified that all of the children had bicycles and that he bought victim A a new bicycle before she started sixth grade because she had made high honor roll while in fifth grade. Defendant testified regarding the timeline of the apartments he lived in with the sisters, which generally corroborated victim A's testimony. Defendant denied that any sexual incidents happened between him and the victims. Defendant stated that he would punish the sisters by taking away their toys and electronics and sometimes by spanking them but denied ever beating them or pulling their pants down when spanking them. On cross-examination, defendant denied that massaging his legs would help him to get or maintain an erection. Defendant also denied ever being alone with victim D in his room.
The verdict is not against the weight of the evidence. As to defendant's specific contention regarding his conviction for predatory sexual assault, given the testimony regarding when the abuse started as well as the testimony that it occurred weekly in the year before victim A turned 13, the jury could reasonably infer that defendant engaged in a course of sexual conduct against victim A that lasted more than three months prior to when she turned 13 (see People v May, 188 AD3d 1309, 1310 [2020], lv denied 36 NY3d 974 [2020]; People v Shackelton, 177 AD3d 1163, 1165 [2019], lv denied 34 NY3d 1162 [2020]). Concerning defendant's conviction for sexual abuse in the first degree, although victim A did not testify that defendant physically held her down in the bathtub and forced her to do anything, the jury was permitted to "consider the victim's age relative to that of defendant, the relationship between them and the victim's fear of what defendant might have done if she did not comply" when deciding whether there was an implied threat (People v Blond, 96 AD3d 1149, 1151 [2012], lv denied 19 NY3d 1101 [2012]). Accordingly, given the frequent sexual and physical abuse and threats victim A experienced, we do not find this conviction to be against the weight of the evidence (see generally id. at 1151-1152). Although defendant does not raise specific arguments as to his remaining convictions, we have carefully examined them and find them to be supported by the weight of the evidence.
Defendant also asserts [*7]that the failure to transcribe the attorneys' questioning of prospective jurors during voir dire has deprived defendant of his right to meaningful appellate review. We disagree. "[A] defendant has a fundamental right to appellate review of a criminal conviction" (People v Yavru-Sakuk, 98 NY2d 56, 59 [2002]). To this end, a "verbatim recordation of the trial proceedings is the better practice, unless waived" (People v Jenkins, 90 AD3d 1326, 1329 [2011] [internal quotation marks, brackets and citation omitted], lv denied 18 NY3d 958 [2012]). However, "the case law makes clear that the absence of a stenographic record does not, per se, require reversal of a defendant's conviction" and "a defendant must show that a request was made that the voir dire proceedings be recorded, the request was denied, and the failure to record the proceedings prejudiced him or her in some manner" (id. at 1329 [internal quotation marks, brackets and citations omitted]; see People v Coward, 138 AD3d 886, 886 [2016], lv denied 27 NY3d 1130 [2016]).
Here, the questioning by County Court of the prospective jurors was recorded by the court reporter, but the attorneys' ensuing questioning was not. However, as is evident from the transcript, any time the court interjected during the questioning, it was recorded. At the reconstruction hearing, this was verified by the court reporter, who testified that, had there been any objections made during the attorneys' questioning, she would have transcribed them. The record reflects none. The court reporter also testified that it was her standard practice not to record the attorneys' voir dire unless requested to. She testified that her general practice was to ask both counsel and the court if anyone wanted voir dire to be recorded, but that request would not be in the record and she could not remember whether she asked in this specific case. In addition to the court reporter, the People called the prosecutor who conducted the trial as well as defendant's trial counsel (hereinafter trial counsel). Although both attorneys stated that they did not have an independent recollection from that day, they were able to provide detailed testimony by referring to the extensive notes they both took during voir dire. Trial counsel testified that he did not know that voir dire was not being transcribed and that he did not tell the court reporter that he wanted it to be transcribed because he so assumed. Both attorneys also testified that, in general, they do not object during voir dire unless something egregious happens. Neither attorney recalled objecting. In light of the foregoing, County Court determined that the People had established that nothing "untoward" happened during jury selection.[FN4]
Given the foregoing, defendant has failed to establish that "he made a request for the continuing voir dire to be recorded, that [County Court] denied a request made by him, or that the failure to record the proceedings prejudiced him" (People [*8]v Coward, 138 AD3d at 887; see People v Jenkins, 90 AD3d at 1329). Although defendant speculates as to how trial counsel's voir dire could have prejudiced him, the record of the reconstruction hearing does not support these claims. We are further unpersuaded by defendant's claim that, because trial counsel was at one point in time, years prior, told that all voir dire would be transcribed, he was "lulled into believing that such transcription was taking place" (People v Jenkins, 90 AD3d at 1329). There was no testimony at the reconstruction hearing supporting that, in this case, anyone led trial counsel to affirmatively believe that transcription was taking place (see id.). Accordingly, we do not find that reversal of the conviction on this ground is warranted.
We turn now to defendant's contentions regarding the introduction of prior uncharged crimes or bad acts — namely, that testimony regarding his use of corporal punishment and physical abuse of the sibling victims has deprived him of his right to a fair trial, particularly in the absence of any limiting instructions. This challenge, however, is unpreserved (see generally People v Shackelton, 177 AD3d at 1166). Specifically, after a question was asked of victim A, early in the trial, regarding whether she witnessed defendant strike any of the sisters, trial counsel promptly objected as defendant was not charged with this crime. A sidebar then took place, outside of the presence of the jury, wherein trial counsel explained that this testimony was "fine" if it was "couch[ed] in terms of this was discipline or corporal punishment," but that that context needed to be addressed. The prosecutor then rephrased the question and there were no further objections nor was there a request for a limiting instruction.
To that end, defendant also cites to trial counsel's failure to object as one of many errors which allegedly rendered defendant's representation at trial ineffective. We disagree. "To prevail on an ineffective assistance claim, a defendant bears the burden of demonstrating that [trial] counsel deprived him or her of a fair trial by providing less than meaningful representation. A defendant cannot meet this burden unless he or she proves that no strategic or other legitimate explanations existed to justify counsel's perceived inadequacies" (People v Perry, 154 AD3d 1168, 1171 [2017] [internal quotation marks and citations omitted]).
Here, it is abundantly clear from the record that trial counsel was mounting a specific trial strategy that the sibling victims were upset at defendant because, among other things, he used corporal punishment as a method of discipline, so they concocted this story about sexual abuse. Indeed, when trial counsel made his motion for a trial order of dismissal at the close of the People's proof he cited to the sibling victims' "motive to lie based on them being upset with [defendant] and the way he discipl[ined] them." Trial counsel also extensively [*9]referred to the sibling victims' motivation to lie throughout his closing. Moreover, trial counsel reinforced that the victims were not credible by questioning why, if the physical abuse was as serious as the sibling victims testified to, there was never any proof of injuries such that a teacher or attorney for the child was alerted to the abuse. Certainly, in a case such of this where, in the absence of any physical proof, the jury's verdict distills to an assessment of credibility, providing the jury with a clear motive for the victims to lie cannot be said to be anything other than a sound trial strategy. Even though that strategy was not ultimately successful, we will not now second-guess it (see People v Head, 90 AD3d 1157, 1159 [2011]).[FN5] We have reviewed trial counsel's other alleged failings as set forth by defendant and find them also to be, "at best, second-guessing with the clarity of hindsight, which does not constitute ineffective assistance" (People v Bateman, 124 AD3d 983, 986 [2015], lv denied 25 NY3d 949 [2015]; see People v Porter, 184 AD3d 1014, 1019-1020 [2020], lv denied 35 NY3d 1069 [2020]). "Overall, the record reflects that trial counsel presented a clear trial strategy, made decisions consistent with that strategy, effectively cross-examined witnesses and made appropriate opening and closing statements, thus providing defendant with meaningful representation" (People v Porter, 184 AD3d at 1019; see People v Santana, 179 AD3d 1299, 1302 [2020], lv denied 35 NY3d 973 [2020]).
Nor do we find that County Court erred by denying defendant's motion to amend the transcripts without first requiring the court reporter to produce her original notes for comparison. The only evidence in support of amending the transcripts was defendant's own self-serving affidavit.[FN6] The People and trial counsel both attested that the transcripts were correct as certified and the court reporter also affirmed that she had reviewed each of defendant's proposed amendments and did not believe that any changes to the transcript were warranted.[FN7] Thus, there is no reason to believe that the court reporter's original notes would suggest anything different. Therefore, the court properly declined to amend the transcripts (see People v Maisonette, 192 AD3d 1325, 1326-1327 [2021], lv denied 37 NY3d 966 [2021]; People v Hummer, 217 AD2d 713, 714 [1995], lv denied 86 NY2d 843 [1995]).
As to defendant's argument that his sentence is excessive, given the seriousness of the offenses and defendant's refusal to take any responsibility for his actions, we decline defendant's invitation to reduce the sentences imposed, which fall within the permissible statutory ranges, in the interest of justice (see generally People v Casalino, 204 AD3d 1078, 1083 [2022]; People v Dawson, 195 AD3d 1157, 1163 [2021], affd ___ NY3d ___ [Apr. 26, 2022]). Finally, we have reviewed the contentions defendant raises in his supplemental brief. However, we are unable to reach the argument [*10]regarding duplicitous counts as it is unpreserved (see People v Allen, 24 NY3d 441, 449-451 [2014]; People v Kalabakas, 183 AD3d 1133, 1137 [2020], lv denied 35 NY3d 1067 [2020]). We have examined the remaining argument, that defendant was convicted of an offense different than that for which he was indicted, and find it to be lacking in merit (see People v Grega, 72 NY2d 489, 496 [1988]; People v DeGroat, 170 AD3d 1281, 1281-1282 [2019]). To the extent not specifically addressed herein, we have examined defendant's remaining contentions and find them to be without merit.
Clark, J.P., Colangelo, Ceresia and McShan, JJ., concur.
ORDERED that the judgment and order are affirmed.

Footnotes

Footnote 1: The testimony established that victim A would have been 11 or 12 years old at the time.

Footnote 2: Other testimony, including that of defendant, established that defendant and the sisters lived in the second apartment from around the fall of 2014 to June 2015, when victim C was 9 to 10 years old.
Footnote 3: Other testimony, including that of defendant, established that defendant and the sisters lived in the third apartment from around June 2015 to April 2016.

Footnote 4: To the extent that defendant is arguing that the People failed to meet their burden at the reconstruction hearing because they did not recreate the actual questions posed by the attorneys during voir dire, we disagree. Indeed, the purpose of a reconstruction hearing is not to create a new transcript, but rather to determine "whether any significant issues arose during the voir dire and were preserved for appellate review" (People v Parris, 4 NY3d 41, 47 [2004]; see People v Glass, 43 NY2d 283, 286 [1977]; see generally People v Rivera, 39 NY2d 519, 523 [1976]). Our review of the reconstruction hearing establishes that the People satisfied their burden of establishing by a preponderance of the evidence that no significant issues arose during voir dire (see generally People v Williams, 39 AD3d 1275, 1275 [2007], lv denied 9 NY3d 965 [2007]).

Footnote 5: We do recognize that there were fleeting references during testimony to conduct which one may say rises to a level beyond corporal punishment to which trial counsel did not object. However, given the overall strategy, trial counsel may have reasonably elected not to oppose the admission of this testimony (see People v Horton, 181 AD3d 986, 997 [2020], lv denied 35 NY3d 1045 [2020]).
Footnote 6: Notably, defendant's proposed amendments largely sought to delete portions of the record that were prejudicial to him.

Footnote 7: Although the reconstruction hearing dealt with voir dire, defendant's motion to amend was pending and, while the court reporter was under oath, County Court briefly asked questions regarding the proposed amendments.