People v Fox (2025 NY Slip Op 07046)

People v Fox

2025 NY Slip Op 07046

Decided on December 18, 2025

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:December 18, 2025

CR-24-1081
[*1]The People of the State of New York, Respondent,
v
John Fox, Appellant.

Calendar Date:November 13, 2025

Before:Clark, J.P., Reynolds Fitzgerald, Lynch, Ceresia and Powers, JJ.

Lisa A. Burgess, Indian Lake, for appellant.
J. Anthony Jordan, District Attorney, Fort Edward (Taylor Fitzsimmons of counsel), for respondent.

Clark, J.P.
Appeal from a judgment of the County Court of Washington County (Kelly McKeighan, J.), rendered September 13, 2022, convicting defendant upon his plea of guilty of the crime of arson in the second degree.
In March 2022, defendant was charged in a 12-count indictment with arson in the second degree and other crimes stemming from allegations that he started a fire at an apartment building in the Village of Greenwich, Washington County. A second indictment was handed up in April 2022 charging defendant with witness tampering in the fourth degree and criminal solicitation in the fifth degree pertaining to his alleged conduct while in jail awaiting trial on the initial indictment. The indictments were consolidated to be tried jointly and, following a Huntley hearing, County Court denied defendant's motion to suppress inculpatory statements he made to law enforcement during a police interview in connection with the fire. Defendant subsequently pleaded guilty to one count of arson in the second degree in satisfaction of both indictments and retained his right to appeal. He was sentenced to a prison term of 15 years, to be followed by five years of postrelease supervision, and ordered to pay $500 in restitution. Defendant appeals.
Defendant argues that County Court improperly declined to suppress his statements to law enforcement, asserting that they were involuntarily made and that police did not cease their questioning despite his unequivocal request for counsel. Although defendant's challenge to the suppression ruling survives his guilty plea and is not precluded by an appeal waiver (see CPL 710.70 [2]; People v Kemp, 94 NY2d 831, 833 [1999]; People v Fernandez, 67 NY2d 686, 688 [1986]), it is unavailing.
"On a motion to suppress, the People bear the burden of proving beyond a reasonable doubt that the defendant's statements to police were voluntarily given, including that any custodial interrogation was preceded by the administration and the defendant's knowing waiver of his or her Miranda rights" (People v Saunders, 232 AD3d 1039, 1042 [3d Dept 2024] [internal quotation marks, brackets and citations omitted], lv denied 43 NY3d 1058 [2025]; accord People v Henry, 237 AD3d 1258, 1260 [3d Dept 2025], lv denied 44 NY3d 982 [2025]; see Miranda v Arizona, 384 US 436, 444-445 [1996]; People v Robinson, ___ NY3d ___, ___, 2025 NY Slip Op 05871, *2 [Oct. 23, 2025]). "[A]n explicit verbal waiver is not required; an implicit waiver may suffice and may be inferred from the circumstances" (People v Harris, 129 AD3d 1522, 1523 [4th Dept 2015] [internal quotation marks and citation omitted], lv denied 27 NY3d 998 [2016]; see People v Davis, 55 NY2d 731, 733 [1981]). "Determining whether a statement is voluntary is a factual issue governed by the totality of the circumstances, and the credibility assessments of the suppression court in making that determination are entitled to deference" (People v Garrand, 189 AD3d 1763, 1768 [3d Dept 2020] [internal quotation [*2]marks, brackets and citations omitted], lv denied 36 NY3d 1120 [2021]). "Once the People have met their burden, the burden of persuasion shifts to the defendant to adduce evidence supporting his or her contention that he or she did not comprehend his or her rights" (id. [internal quotation marks, brackets and citation omitted]; see People v Leppanen, 218 AD3d 995, 1002 [3d Dept 2023], lv denied 40 NY3d 1081 [2023]; People v Paul, 202 AD3d 1203, 1208 [3d Dept 2022], lv denied 38 NY3d 1034 [2022]).
"When a defendant in custody unequivocally requests the assistance of counsel, any purported waiver of that right obtained in the absence of counsel is ineffective" and the police must cease their interrogation (People v Glover, 87 NY2d 838, 839 [1995] [citations omitted]; see People v Porter, 9 NY3d 966, 967 [2007]). "Whether a particular request [for counsel] is or is not unequivocal is a mixed question of law and fact that must be determined with reference to the circumstances surrounding the request, including the defendant's demeanor, manner of expression and the particular words found to have been used by the defendant" (People v Henry, 237 AD3d at 1261 [internal quotation marks and citations omitted]; see People v Bowman, 194 AD3d 1123, 1127 [3d Dept 2021], lv denied 37 NY3d 963 [2021]). "The relevant inquiry is whether a reasonable police officer would have understood the statement in question as a request for an attorney" (People v Bowman, 194 AD3d at 1128 [internal quotation marks and citations omitted]; see People v Jemmott, 116 AD3d 1244, 1247 [3d Dept 2014]). "[A] suggestion that counsel might be desired; a notification that counsel exists; or a query as to whether counsel ought to be obtained will not suffice to unequivocally invoke the indelible right to counsel" (People v Dawson, 38 NY3d 1055, 1055 [2022] [internal quotation marks and citation omitted]; accord People v Burton, 215 AD3d 1054, 1060 [3d Dept 2023], lv denied 40 NY3d 927 [2023]). "The factual determinations made by the suppression court are entitled to substantial deference and will not be overturned unless clearly contrary to the evidence" (People v Bermudez, 217 AD3d 1261, 1264 [3d Dept 2023] [internal quotation marks and citations omitted], lv denied 40 NY3d 996 [2023]; see People v Moore, 162 AD3d 1123, 1126 [3d Dept 2018]).
During the Huntley hearing, a police investigator who lived in the vicinity of the subject apartment building testified that he observed a fire at the building on February 6, 2022. Upon contacting his supervisor, the investigator learned that a suspect, described as a "barefooted white male [who] was bleeding," had been observed jumping from the building and running away. Police quickly apprehended the suspect — who was later identified as defendant — by following a blood trail in snow on the ground. When the investigator arrived at the location of defendant's arrest, he observed defendant in handcuffs surrounded by a group of police officers. The investigator [*3]began asking defendant questions about pedigree information and the nature of his injuries to ascertain whether he needed medical attention. After defendant acknowledged that his hands were burned and he was bleeding, the investigator inquired as to "how it occurred" and defendant revealed that his injuries were "from a lighter." He described defendant's demeanor as "very calm" and "tearful" at this point.
Defendant was subsequently transported to the police station, where an ambulance was waiting to take him to the hospital. The investigator testified that he assisted defendant into the ambulance and, while inside, advised defendant of his Miranda rights on three occasions by reading from the back of his Miranda card issued by the State Police. According to the investigator, defendant "just stare[d] at" him the first two times he received his Miranda warnings, but, on the third reading, "acknowledged a yes to the questions" by nodding his head. Although the investigator acknowledged that his reading of the Miranda warnings to defendant was not captured on video, he explained that this was because he did not have a recording device on him at the time.
The investigator did not converse with defendant during the ambulance ride, but he overheard defendant tell the paramedic that he did not want to discuss the fire with the paramedic. Although the investigator described defendant's demeanor during the ambulance ride as "calm" and "appropriate," he testified that it changed at the hospital, revealing that defendant talked calmly in front of medical personnel but would put his "head back" and start "moaning" every time the investigator attempted to question him about the fire. Defendant was discharged from the hospital after being assessed by a mental health professional, who did not find him to be suffering a mental health crisis in any way. Nonetheless, the investigator testified that, when defendant was informed that he was cleared for discharge, he "went back to the state of moaning and making inappropriate comments," at one point stating that he was "nine months pregnant" and in "level [10] pain."[FN1] Insofar as defendant was able to carry on a coherent conversation with medical personnel and had passed a mental health evaluation, the investigator believed that defendant was "attempting to get admitted to the hospital" by making such statements.
After being discharged from the hospital, defendant was transported back to the police station for an interview, accompanied by the investigator and another police officer. As depicted in body camera footage from the car ride, the investigator asked defendant questions about the fire and defendant made several inculpatory statements at this time, revealing that he was present in the building, had ignited a beanie and had thrown it onto a chair. Notably, defendant was able to engage in a coherent conversation at this time, explaining that he had used rubbing alcohol — which he referred to by the chemical compound[*4]"isopropyl" — as the ignition agent.
Upon arriving at the police station, defendant was escorted to an interview room, where he was provided with food and water. Police also wrapped him in blankets. As reflected in the video footage from the interview room, defendant was, for the most part, calm and quiet when he was alone in the room. However, he would start moaning and giving confused answers when officers entered the room to question him about the fire. At one point while in the interview room, defendant asked whether the cameras in the room were turned on. He also "glanced . . . up toward the camera in the corner" of the room shortly after he was escorted inside and began to moan upon doing so.
During his questioning of defendant at the police station, the investigator drew a diagram of the subject apartment building and defendant confirmed the location where he started the fire, using terminology describing "the point of origin," and again confirming the materials he used to light the fire.[FN2] At one point during the interview, defendant described the investigator as a "mediator." Defendant thereafter requested a "mediator" on two occasions while being questioned, one time asking whether the investigator could "bring another mediator in here" and, later, asking, "can I please have a mediator?" In response to the second request for a mediator, the investigator told defendant that he was "not a mediator," but an investigator with the State Police. The investigator testified that an attorney would have been provided to defendant had he requested one, but he never did. In an attempt to establish that his request for a mediator was a request for an attorney, defendant took the stand during the Huntley hearing and testified that he understood the term "mediator" to be someone who "interprets the law." However, on cross-examination, defendant acknowledged that he knew what an attorney does and stated that he remembered "asking for an attorney or a mediator" during the interview. He further testified that he was uncertain about whether the investigator had read him his Miranda rights prior to being interviewed at the police station.
In denying defendant's suppression motion, County Court found that defendant was in custody "when he was first apprehended [by police] and handcuffed," but that he was not being interrogated by the investigator when he made statements regarding pedigree information and the nature of his injuries prior to being read his Miranda rights. Accordingly, the court found that defendant's statements in response to such pedigree questioning were admissible. As for the inculpatory statements defendant made in the police vehicle after he was discharged from the hospital and while at the police station, the court found that the investigator "testified credibly" and that defendant's statements were admissible since they were "obtained after he [had previously] knowingly and voluntarily waived his Miranda rights." County Court also rejected [*5]defendant's argument that he had unequivocally invoked his right to counsel during the interview conducted at the police station, finding, based upon "his demeanor on the stand [and] his evasiveness and penchant for self-contradiction on cross examination," that his testimony indicating that he thought a mediator was an attorney was not credible.
On this record, County Court properly declined to suppress defendant's statements to police. We recognize that the reading of Miranda warnings to defendant was not ideal, as it was not captured on video or otherwise recorded. However, the investigator testified during the Huntley hearing that he apprised defendant of his Miranda rights on three occasions while he was in the ambulance awaiting transport to the hospital and that defendant acknowledged his understanding of his rights through a headshake the third time. The video footage entered into evidence during the Huntley hearing confirms that defendant subsequently made statements about the fire without ever invoking his right to remain silent. County Court found the investigator's hearing testimony to be credible and we "discern no reason to reject" the court's determination that defendant was adequately apprised of his Miranda rights (People v Mattis, 108 AD3d 872, 874 [3d Dept 2013], lv denied 22 NY3d 957 [2013]; see People v Rydell, 175 AD2d 956, 957 [3d Dept 1991]).
As for whether defendant had the mental capacity to comprehend his rights and to make a knowing, voluntary and intelligent waiver, County Court "closely scrutinized the totality of the circumstances under which defendant's waiver was made" (People v Comfort, 6 AD3d 871, 873 [3d Dept 2004]), and the hearing evidence supports the court's determination that "defendant's waiver was voluntary and [he] was able to understand [his] rights and appreciate the nature and consequences of [his] actions" (People v Bolarinwa, 258 AD2d 827, 829 [3d Dept 1999], lv denied 93 NY2d 1014 [1999]). To that end, the investigator testified that, prior to making any of the inculpatory statements, defendant had undergone a mental health evaluation at the hospital and was not found to be mentally incapacitated in any way (compare People v White, 85 AD2d 787, 787-788 [3d Dept 1981]). Although defendant displayed some erratic behavior [FN3] both before and during the custodial questioning, there was evidence from which County Court could conclude that defendant was malingering, including video footage depicting that he was generally calm when he was alone in the interview room but that his demeanor changed in front of police officers. Perhaps most notably, defendant was provided with blankets, food and water prior to being questioned at the police station, and he made several sophisticated statements to police, after being apprised of his Miranda rights, that refute his claim that he lacked the ability to comprehend what was going on, including referring to the chemical compound "isopropyl" when explaining the ignition [*6]agent he used to start the fire and utilizing the technical term "point of origin" to identify the location where he did so. Considering the foregoing, and deferring to County Court's credibility determinations, we are satisfied that the People proved beyond a reasonable doubt that defendant validly waived his Miranda rights and that his statements to police were voluntary (see People v Bermudez, 217 AD3d at 1264; People v Garrand, 189 AD3d at 1768). We further conclude that defendant's testimony, which County Court found to be "evasive" and not credible, did not satisfy his burden of persuasion to demonstrate otherwise (see People v Garrand, 189 AD3d at 1769).
As for whether defendant unequivocally invoked his right to counsel during the interview, defendant did not ask for an attorney at any time while being questioned (see People v Culver, 69 AD3d 976, 977 [3d Dept 2010]). Although he twice requested a "mediator," he made statements indicating that he was referring to police officers when he used that term and that he was seeking for the investigator to bring another officer into the interview room (see generally People v Glover, 87 NY2d at 839; compare People v Harris, 177 AD3d 1199, 1203 [3d Dept 2019], lv denied 35 NY3d 970 [2020]). In these circumstances, we conclude that "a reasonable police officer would [not] have understood" defendant's request for a mediator to be a request for an attorney and, accordingly, there is no basis to disturb County Court's determination that defendant did not unequivocally invoke his right to counsel (People v Bowman, 194 AD3d at 1128 [internal quotation marks and citations omitted]).
Defendant also seeks to vacate his plea on the ground that it was not knowing, voluntary and intelligent, emphasizing that, before pleading guilty, he underwent a mental health evaluation and the psychologist who performed the evaluation found that he had a diminished mental capacity at the time of the underlying event and could not form the intent necessary to sustain a charge of arson in the second degree. Defendant also notes that he made statements during the postplea probation interview indicating that he accidentally started the fire and that he had spent the day inhaling nitrous oxide prior thereto, thereby negating the intent element of the crime. Defendant's challenge to the voluntariness of the plea is unpreserved, as he failed to file a motion to withdraw the plea prior to sentencing despite an adequate opportunity to do so (see People v Harrigan, 239 AD3d 1153, 1155 [3d Dept 2025]; People v Snyder, 235 AD3d 1072, 1073 [3d Dept 2025]). Defendant did not make any statements during the plea allocution or at sentencing "that negated an element of the crime or cast doubt on the voluntariness of the plea so as to trigger the narrow exception to the preservation rule" (People v Harrigan, 239 AD3d at 1155), and "th[e] plea record does not support his claim that he was unable to understand the proceedings such that the plea [*7]was invalid" (People v Bailey, 232 AD3d 1031, 1034 [3d Dept 2024], lv denied 43 NY3d 929 [2025]). During the plea allocution, County Court confirmed that defendant had viewed a copy of the report authored by the mental health professional and that he wished to plead guilty despite the potential availability of a psychiatric and/or intoxication defense. Further, "[t]o the extent defendant argues that [his] statements to the Probation Department . . . triggered the narrow exception to the preservation rule and imposed a duty of further inquiry, . . . [his] 'unsworn, postplea statements to the Probation Department — to the extent that they were inconsistent with h[is sworn] admissions during the plea allocution — were unsubstantiated and did not impose a duty of further inquiry upon County Court' " (People v Harrigan, 239 AD3d at 1155, quoting People v Sims, 207 AD3d 882, 884 [3d Dept 2022], affd 41 NY3d 995 [2024]; see People v Bailey, 232 AD3d at 1035). In any event, County Court did inquire about defendant's statements to the Probation Department during the sentencing hearing, eliciting an assurance from defendant that his prior admission of guilt during the plea colloquy was accurate. Consequently, there is no basis upon which to vacate defendant's plea.
Defendant's remaining contentions, to the extent not expressly addressed, have been considered and found lacking in merit.
Reynolds Fitzgerald, Lynch, Ceresia and Powers, JJ., concur.
ORDERED that the judgment is affirmed.

Footnotes

Footnote 1: Video footage from body cameras worn by other police officers present at the hospital — which was entered into evidence during the Huntley hearing — confirmed the investigator's testimony regarding defendant's statements to this effect upon being discharged from the hospital.

Footnote 2: The investigator testified that he was with defendant from approximately 2:00 p.m. on the date of the interview until around midnight, including the time at the hospital and the police station. 

Footnote 3: In a supporting deposition filed in connection with two felony complaints originally brought against defendant (see CPL 100.20), defendant's sister revealed that, at the time of the fire, defendant was using "whippets" (nitrous oxide in spray canisters) "all day every day."