People v Robinson (2025 NY Slip Op 05871)

People v Robinson

2025 NY Slip Op 05871

Decided on October 23, 2025

Court of Appeals

Cannataro, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on October 23, 2025

No. 78 

[*1]The People & c., Respondent,
v
Savion Robinson, Appellant.

Carola M. Beeney, for appellant.
Peter Rienzi, for respondent.
National Association of Criminal Defense Lawyers et al., amici curiae.

CANNATARO, J.:
Defendant appeals from an order upholding the admission of an incriminating statement he made to police while handcuffed following a physical altercation in Times Square with another man. The lower courts concluded that Miranda warnings were not required because the police were engaged in routine investigatory questioning to determine whether a crime had occurred. We hold that defendant was improperly subjected to custodial interrogation and that his statement should have been suppressed. We affirm the Appellate Division order, however, because the error was harmless.
I.
In 2020, defendant Savion Robinson was arrested for causing physical injury in the course of stealing a bicycle. In advance of his bench trial for robbery in the second degree, defendant moved to suppress his at-the-scene admission to police officers that he punched the victim, arguing that the statement was the product of custodial interrogation conducted without Miranda warnings (see generally Miranda v Arizona, 384 US 436 [1966]). Supreme Court ordered a hearing to determine admissibility.
At the hearing, police officer Anthony Sasso testified that he was on uniformed patrol in Times Square just before midnight when he observed two men, defendant and the victim, fighting near the intersection of Broadway and 46th Street. According to Officer Sasso, he and several other police officers intervened, handcuffed both men, and proceeded to question them about who started the fight and why. The victim asserted that the fight began when [*2]defendant stole his bicycle. After questioning, defendant eventually admitted to punching the victim. The officers did not give defendant Miranda warnings before obtaining his statement. Officer Sasso placed defendant under arrest after reviewing surveillance footage that corroborated the victim's allegations.
The surveillance video was introduced into evidence at the hearing, as was footage from body cameras worn by Officer Sasso and fellow police officer Jose Espinal. The surveillance footage shows defendant taking the bicycle and the resulting scuffle. The body camera footage captures the police intervention and questioning. After the officers pull the men apart and handcuff them, Officer Sasso can be heard assuring the victim "we're gonna figure this out" as the victim accuses defendant of attacking him. Officer Espinal initially focuses on defendant, asking him the following series of questions: "You all right? What's going on? What's going on, big guy? What's going on? Do you need medical attention? What's going on? Do you know him [the victim]? Do you guys know each other?" Defendant at one point responds "[h]e just grabbed me." At approximately the same time, another officer can be heard asking defendant "do you guys have beef? Why'd you go after him like that? I saw what you did, so why'd you do it? I saw what you did, so why'd you go after him like that? So you attacked him?" Defendant's responses to these questions, if any, are unintelligible.
Officers Sasso and Espinal then turn to the victim, who is standing only a few feet away, and ask him what happened. The victim maintains that he was assaulted by defendant after he attempted to stop defendant from stealing his bicycle. After listening to the victim for several minutes, Officer Espinal returns to defendant and asks: "What happened? I heard his side, let me hear your side, what happened?" When defendant does not immediately answer, another officer adds "take your time, it is what it is." Defendant finally responds that he punched the victim. This statement is made about eight minutes into the police encounter as defendant remains handcuffed and surrounded by uniformed officers.
The prosecution relied on People v Huffman (41 NY2d 29 [1976]) to argue that police may temporarily detain and question a suspect without administering Miranda warnings while they are determining—in the prosecutor's words—"whether or not there was a crime committed." Supreme Court denied defendant's motion to suppress the statement, explaining "[t]his seems to be the classic case of investigatory questioning rather than custodial interrogation," and therefore Miranda warnings were unnecessary. Following a bench trial, the court acquitted defendant of second-degree robbery but convicted him of the lesser-included charge of robbery in the third degree (Penal Law § 160.05). Defendant appealed.
The Appellate Division affirmed. As relevant here, the court concluded that there was no custodial interrogation requiring Miranda warnings because "a reasonable innocent person in defendant's situation would have believed that the police were still in the process of gathering information about the fight at the time the officer asked 'What happened' " (221 AD3d 435, 436 [1st Dept 2023]). The court also concluded that "any error was harmless in light of the overwhelming evidence of defendant's guilt" (id.). A Judge of this Court granted defendant leave to appeal (41 NY3d 1020 [2024]).
II.
Both the State and Federal Constitutions protect the privilege against self-incrimination (NY Const, art I, § 6; US Const, 5th Amend). Among other things, this constitutional right prohibits the People from using a statement made by a defendant during "custodial interrogation" unless the prosecution can demonstrate use of the now-familiar Miranda warnings (384 US at 444; People v Berg, 92 NY2d 701, 704 [1999]). Whether a particular defendant was subjected to custodial interrogation presents a mixed question of law and fact over which this Court has limited powers of review. We will affirm the determination of the lower courts if there is support in the record for the conclusion reached (People v Paulman, 5 NY3d 122, 129 [2005]).
To ascertain custodial status, courts must consider whether a reasonable person innocent of any wrongdoing would have believed that they were not free to leave, and whether there was a forcible seizure which curtailed that person's freedom of action to the degree associated with a formal arrest (People v Cabrera, 41 NY3d 35, 52 [2023]). Recently, in Cabrera, we held that a defendant was in custody when, after receiving a tip from law enforcement in another state, three police officers "approached him at night, on a residential street, and handcuffed him before questioning him about the firearms in his vehicle" (id.). Although we declined to create a per se rule that handcuffs place an individual in custody in all instances, we warned that "there may be very few circumstances where a handcuffed person is not in custody for purposes of Miranda given the obvious physical constraint and association with formal arrest" (id. at 53). Therefore, the use of handcuffs must be given "very substantial weight" in the custody inquiry (id.). Applying that rule, we concluded that "[t]he level to which the police restricted Cabrera's [*3]movement was of a degree associated with a formal arrest" (id. at 52). We also emphasized that nothing in the record "suggest[ed] that the defendant had any reason to believe that he would be handcuffed only for a limited duration" (id.).
The decisions of the lower courts in this case predate the guidance we provided in Cabrera. Here, the record similarly lacks support for Supreme Court's conclusion that defendant was not in custody when he was handcuffed, surrounded by numerous officers, and questioned about the altercation. Defendant remained restrained as he was searched, questioned, and repeatedly accused of theft and assault by the victim over an approximately eight-minute period. Defendant's freedom of movement was restricted to a degree comparable to a formal arrest, and he was given no reason to believe he would shortly be released or permitted to leave. Indeed, a reasonable person in defendant's position would likely have understood that he was suspected of committing a crime, and "that removal or maintenance of the handcuffs depended on . . . [him] responding to questions posed"—a coercive circumstance federal courts have treated as indicative of custody in factually similar cases (see United States v Newton, 369 F3d 659, 677 [2d Cir 2004]).
The next question is whether defendant was subjected to interrogation. Under well settled law, interrogation "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect" (Rhode Island v Innis, 446 US 291, 301 [1980]; People v Ferro, 63 NY2d 316, 322 [1984]). In this case, defendant was asked several express questions about his physical altercation with the victim. Over the course of the encounter, the officers also made defendant aware they had witnessed him punch the victim and heard the victim's version of events. And they continued asking defendant for his side of the story even after Officer Sasso observed that he was "not talking." In these circumstances, it was foreseeable that the officers' words and actions would generate an incriminating response (see Innis, 446 US at 302).
Contrary to the lower courts' reasoning, it is not dispositive that defendant was questioned in the immediate aftermath of the altercation, while the officers were still determining whether a crime had occurred—circumstances Supreme Court seemingly relied on in deeming the encounter a "classic case of investigatory questioning" that did not require Miranda warnings. Our case law draws no categorical distinction between interrogation and so-called investigatory questioning. Interrogation is almost definitionally investigatory in nature. And while we have recognized a "distinction between coercive interrogation and permissible street inquiry" (Huffman, 41 NY2d at 32), the most salient difference between these categories is not when the questioning takes place, but the presence or absence of custody (see id. at 32-33, distinguishing between People v Rodney P. [Anonymous], 21 NY2d 1 [1967], and People v Shivers, 21 NY2d 118 [1967]). As we have explained, "routine police investigation of suspicious conduct on the street generally does not entail a significant deprivation of freedom which would require Miranda warnings" (Matter of Kwok T., 43 NY2d 213, 218 [1977]). Absent "both the elements of police 'custody' and police 'interrogation,' " there is no "constitutional requirement that the police recite interrogation warnings when they direct questions or comments at members of the public or solicit information and assistance" (see Huffman, 41 NY2d at 33 [emphasis added]). But where, as here, investigatory questions are directed to a person who is in custody, under circumstances police should know are likely to yield an incriminating response, Miranda warnings are required.
Huffman does not support a different rule. There, the defendant and a number of other individuals were gathered behind a deli in the middle of the night when police officers approached, causing them to scatter. The officers found the defendant hiding in a bush, drew their weapons, and asked "What are you doing back here?," to which the defendant replied "We were trying to break into that store" (see Huffman, 41 NY2d at 30). In holding that the officer's question did not constitute interrogation, we emphasized that the statement was made not only at the scene but at a particularly volatile moment (see id. at 34 [describing the situation confronting the officers as "a potential assault from an unknown person fleeing from what appeared to be the scene of criminal activity" and noting that "immediate clarification was necessary before taking drastic action"]). In the almost half-century since Huffman was decided, the United States Supreme Court has made clear that the existence of interrogation turns on the foreseeability of an incriminating response (see Innis, 446 US at 301-302). The volatile circumstances we referenced in Huffman are more relevant, instead, to a public safety exception to the Miranda rule (see New York v Quarles, 467 US 649 [1984]). Huffman must be read with these jurisprudential developments in mind, but at no point has it ever supported a rule that questions asked at the scene of a suspected crime, during or shortly after the suspected crime's commission, are categorically exempt from Miranda.
Notwithstanding this constitutional error, the Appellate Division correctly concluded that the admission of defendant's unwarned statement was harmless beyond a reasonable doubt. The evidence at trial, including the victim's and Officer Sasso's unrebutted trial testimony and the video footage, overwhelmingly established defendant's guilt. Further, there is no reasonable possibility that the admission of defendant's statement affected the outcome of the trial (see People v Best, 19 NY3d 739, 744 [2012]; People v Crimmins, 36 NY2d 230, 240-241 [1975]).
Accordingly, the order of the Appellate Division should be affirmed.
Order affirmed. Opinion by Judge Cannataro. Chief Judge Wilson and Judges Rivera, Garcia, Singas, Troutman and Halligan concur.
Decided October 23, 2025