People v Noble (2025 NY Slip Op 07043)

People v Noble

2025 NY Slip Op 07043

Decided on December 18, 2025

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:December 18, 2025

CR-22-2267
[*1]The People of the State of New York, Respondent,
vTruvock Noble, Appellant.

Calendar Date:November 13, 2025

Before:Clark, J.P., Reynolds Fitzgerald, Lynch, Ceresia and Powers, JJ.

Craig Meyerson, Peru, for appellant.
Emmanuel C. Nneji, District Attorney, Kingston (Joan Gudesblatt Lamb of counsel), for respondent.

Clark, J.P.
Appeal from a judgment of the County Court of Ulster County (Bryan Rounds, J.), rendered June 16, 2022, upon a verdict convicting defendant of the crimes of murder in the second degree and criminal possession of a weapon in the second degree (two counts).
Defendant was charged by indictment with murder in the second degree and two counts of criminal possession of a weapon in the second degree in connection with a shooting on March 21, 2021 in the City of Kingston, Ulster County that resulted in the victim's death. After conducting a Huntley hearing, County Court denied defendant's motion to suppress statements he made to law enforcement following his arrest, finding that they were admissible at trial. A jury trial ensued, following which defendant was convicted as charged. County Court denied defendant's postconviction motion to set aside the verdict based upon legally insufficient evidence and sentenced him to a prison term of 25 years to life on the murder conviction, with lesser concurrent prison terms of 15 years, to be followed by five years of postrelease supervision, on the two weapons possession convictions. Defendant appeals.
Defendant contends that the verdict is not supported by legally sufficient evidence and is contrary to the weight of the evidence, arguing that the People did not establish his identity as the shooter or that he ever possessed a firearm. Although defendant moved for a trial order of dismissal at the close of the People's case-in-chief, which he appropriately renewed upon the close of all proof, he made only a generalized motion that did not raise the specific arguments he advances on appeal. Consequently, defendant's legal sufficiency challenge is not properly preserved for appellate review (see People v Flanigan, 242 AD3d 1374, 1375 n 2 [3d Dept 2025]; People v Baez, 232 AD3d 1044, 1044-1045 [3d Dept 2024]; People v Franklin, 216 AD3d 1304, 1305 [3d Dept 2023], lv denied 40 NY3d 934 [2023]). "Nevertheless, a weight of the evidence challenge, which bears no preservation requirement, also requires consideration of the adequacy of the evidence as to each element of the crimes" (People v Doane, 212 AD3d 875, 876 [3d Dept 2023] [internal quotation marks and citations omitted], lv denied 39 NY3d 1154 [2023]) to ensure that they were "proven beyond a reasonable doubt" (People v Marin, 239 AD3d 1028, 1029 [3d Dept 2025] [internal quotation marks and citations omitted]; see People v Hatch, 230 AD3d 908, 909 [3d Dept 2024], lv denied 42 NY3d 1020 [2024]).
As charged to the jury, "[a] person is guilty of murder in the second degree when . . . [w]ith intent to cause the death of another person, he [or she] causes the death of such person" (Penal Law § 125.25 [1]). A person is guilty of criminal possession of a weapon in the second degree when "with intent to use the same unlawfully against another, such person . . . possesses a loaded firearm" (Penal Law § 265.03 [1] [b]), or knowingly "possesses any loaded firearm" outside [*2]of his or her home or place of business (Penal Law § 265.03 [3]; see People v Taylor, 207 AD3d 806, 808 [3d Dept 2022], lv denied 39 NY3d 942 [2022]). A loaded firearm "means any firearm loaded with ammunition or any firearm which is possessed by one who, at the same time, possesses a quantity of ammunition which may be used to discharge such firearm" (Penal Law § 265.00 [15]).
At trial, the People proffered evidence establishing that the victim was shot outside of a residence on Liberty Street in the City of Kingston on the afternoon of March 21, 2021. The shooting took place near the Broadway Lights Diner and the victim, who suffered at least two independently fatal gunshot wounds, succumbed to his injuries. As for the circumstances precipitating the event, the People elicited testimony from several witnesses who were in the vicinity of the shooting on the date in question. To that end, an individual who was painting his daughter's bedroom on the first floor of a residence on Liberty Street (hereinafter witness 1) testified that, around 1:20 p.m., his wife asked him to go outside after hearing people fighting in the street. As he exited the premises, witness 1 heard "the impact of bullets," saw the victim lying on the ground, and observed another individual standing next to the victim, who then turned to the cross the street and put a weapon into his pants as he did so. Witness 1 testified that the person who put a weapon in his pants after the shooting was wearing "a jacket or . . . sweater" with a hoodie over his head, as well as "black and gray pants" and black shoes. When that individual was walking away from the scene toward Prospect Street, witness 1 watched him take his hood off and observed that he had a black cap on his head, describing it as one "that cooks put on their head when they [are] cooking." Witness 1 testified that his wife recognized the victim as an individual who collected cans and bottles in the neighborhood, and that the victim was wearing a backpack as well as carrying a bag from Hannaford at the time of the shooting. Witness 1's wife (hereinafter witness 2) also gave testimony to this effect, explaining that she heard three gunshots outside of their residence that afternoon. Like her husband, witness 2 testified that, when she went outside, she saw someone cross the road and walk toward Prospect Street, testifying that the individual was wearing gray pants, a jacket with a hood over his head and sneakers that were white, red and black. Witness 2 also saw this individual take his hood off at one point and confirmed that he had "other coverage on his head."
After canvassing the area and speaking with witnesses, law enforcement obtained surveillance footage that they believed captured a portion of the event. The video was entered into evidence at trial as People's Exhibit 2 and played for the jury. As shown in the video, at approximately 1:21 p.m. on the date of the shooting, the video depicted an individual wearing a [*3]black hoodie, gray pants, and red and black sneakers walking down Broadway in the direction of the Broadway Lights Diner with wired headphones in his ears. The individual then crossed the street and stopped near a chain-link fence on the corner of Broadway and Liberty Street. As depicted in the video, this individual placed his hand on the fence to brace himself, lifted his left leg, and reached his right hand toward his ankle, appearing to retrieve something from that area. The individual thereafter turned off Broadway onto Liberty Street, walked past the Broadway Lights Diner, and got into an altercation with another individual who was walking down Liberty Street in the opposite direction, carrying bags. Although the actual shooting occurred on a portion of Liberty Street that was outside of the surveillance camera's view, the video clearly showed that the individual walking down Liberty Street with bags in his hands turned around and was chased by the individual wearing red and black sneakers who had recently stopped at the fence to retrieve something from near his ankle. A few seconds after the two individuals ran down Liberty Street out of view of the camera, three gunshots can be heard on the video.
Based upon this video, the individual shown walking down Broadway shortly before the shooting wearing a hoodie, gray pants, and black and red sneakers became the prime suspect in the victim's death. Police generated a still photograph from the surveillance video depicting a clear image of the suspect's face and then canvassed the area to see if anyone could identify him, ultimately making contact with an individual (hereinafter witness 3) who had known defendant for 20 years and identified him as the individual depicted in the photograph. Witness 3 confirmed at trial that she had no doubt in her mind that the individual in the photograph was defendant. Another individual who was eating at the Broadway Lights Diner at the time of the incident (hereinafter witness 4) also testified on the People's behalf, stating that he saw a "skinny guy" reach toward his foot prior to turning down Liberty Street before the shooting. Witness 4 subsequently saw this same individual running down Liberty Street toward Prospect Street and "heard three shots." Although witness 4 did not get a good visual of the individual he saw running down Liberty Street, he testified that, at the time of the incident, he thought the individual was a young man who was "clean cut." However, after viewing the still photograph generated from the surveillance video, which showed that the individual depicted therein was an older man with facial hair, witness 4 identified the individual as defendant, someone he had known for over 20 years.
The People also elicited testimony from a resident of an apartment located on the corner where the shooting took place (hereinafter witness 5) who explained that, around 1:23 p.m., she heard a gunshot while she was in the bathroom. When witness 5 looked [*4]out the window, she witnessed a man on Liberty Street "[f]all [to] the floor" and saw someone standing next to him with his "hand extended."[FN1] Another resident of Liberty Street (hereinafter witness 6) testified at trial that she also heard the sound of gunshots on the afternoon in question while she was in her home office in the vicinity of the Broadway Lights Diner. Upon looking out her window, which had a direct view of the diner, witness 6 saw two men, one of whom was walking briskly toward Prospect Street and who she described as a black male around six feet tall. Witness 6 "noticed [that this individual] was fumbling with something in his left hand" but she did not see a gun, stating that it looked like he was fumbling with a cell phone. Witness 6 testified that the individual she observed walking brisky toward Prospect Street looked over his left shoulder "at least once" while she was observing him. She testified that he was wearing "distinctive" red and black shoes, black or gray pants, and "a black jacket or sweatshirt." This witness also observed a surgical mask hanging from this individual's ear.
As for the physical evidence in this case, police found two 9 millimeter shell casings in the middle of the road "several feet away" from the victim. The shell casings came from a semiautomatic pistol with a 9 millimeter caliber. The People elicited testimony from police officers that this type of weapon is not heavy, can be worn on the ankle and is easily concealable. Police also located a single bullet at the scene, which appeared to have blood on it. After police spoke with the two witnesses who identified defendant as the individual depicted in the still image walking down Broadway around the time of the incident with distinctive red and black shoes on, they began efforts to locate defendant. Defendant was eventually located near a hotel in the Town of Fishkill, Ulster County on the morning of March 23, 2021 and attempted to flee when police approached him.[FN2] Nonetheless, defendant was successfully apprehended and transported to the police station for questioning. No weapons were recovered from defendant upon his arrest, but, notably, he was wearing the same clothing as the person depicted in the video footage from People's Exhibit 2. One of the police officers who transported defendant to the police station testified that, while he was in the patrol vehicle, defendant spontaneously stated, "You guys know someone stole my gun, you guys know that, right?" Police officers had not informed defendant that he was being charged with murder or possession of a gun when he made these statements and were not asking him any investigative questions at this time.
The detective who interviewed defendant at the police station after his arrest testified at trial that defendant admitted to being in the Broadway area at the time of the shooting and mentioned relevant landmarks in the vicinity of the Broadway Lights Diner, including a gravel car lot near the [*5]corner of Broadway and Liberty Street. The detective further testified that defendant identified himself as the individual in the surveillance footage contained in People's Exhibit 2 walking down Broadway toward Liberty Street wearing a black hoodie, gray pants, and black and red sneakers. Although defendant denied being involved in the shooting — claiming that he had received telephone calls from an individual who informed him that the shooter was working for the police — he also admitted to the detective that he had been in an altercation in the area of the shooting on the date in question with an individual who was carrying a Hannaford bag — i.e., the same type of bag found on the victim at the time of the shooting. Defendant referred to the individual with whom he was in an altercation as a "missile" who was acting on someone else's behalf to attack him, explaining that he believed there was a bounty out for him due to an altercation he had been in earlier that year. The detective further testified that, when asked about the shooting, defendant stated that he "was running twice, boom boom" and that "[he] was upset [he] ran the first time." As noted by the detective, throughout the interview, defendant repeatedly made a gesture with his hands that resembled a gun. The People played for the jury a redacted video of defendant's police interview, which corroborated the detective's trial testimony regarding defendant's statements while being questioned.
Defendant's case consisted of, among other things, testimony from a crime scene forensic analyst who explained that particles from gunshot residue can become embedded within fabric and persist on clothing "for a long period of time." The analyst faulted police for declining to test defendant's garments for gunshot residue following his arrest. Defendant also played for the jury video clips of some of the responding officers' body camera footage, which showed their initial efforts to receive eyewitness statements and security footage from local businesses. As depicted in these videos, the initial witnesses described the perpetrator as wearing green pants and a brown top. One of the witnesses also described the perpetrator as being short, even though defendant is over six feet tall.
On this record, a different verdict would not have been unreasonable insofar as there was no direct eyewitness to the shooting, the murder weapon was never found, and several of the individuals police initially spoke with described that the individual who walked briskly down Liberty Street after the gunshots went off was wearing different clothing than the alleged perpetrator depicted in the video footage from People's Exhibit 2 (see People v Moore, 223 AD3d 1085, 1093 [3d Dept 2024], lv denied 41 NY3d 1003 [2024]; People v Calafell, 211 AD3d 1114, 1117 [3d Dept 2022], lv denied 39 NY3d 1077 [2023]). However, when viewing the evidence in a neutral light and weighing "the relative probative force of conflicting testimony [*6]and the relative strength of conflicting inferences that may be drawn" therefrom — as we must when undertaking a weight of the evidence review (People v Bleakley, 69 NY2d 490, 495 [1987] [internal quotation marks and citation omitted]; see People v Bohn, 242 AD3d 1357, 1365 [3d Dept 2025]) — we are satisfied that the People proved defendant's identity as the shooter beyond a reasonable doubt. The surveillance footage clearly showed an individual who was wearing a black hoodie, gray pants, and distinctive black and red shoes chasing the victim down Liberty Street after having reached toward his ankle to retrieve something. Although the shooting itself was not captured on video, gunshots went off only a few seconds after these two individuals ran out of the camera's view, permitting a reasonable inference that the individual in black and red shoes had retrieved a gun when he reached toward his ankle while on the corner of Broadway and Liberty Street and was the shooter. Indeed, at least two witnesses testified that they saw something in the perpetrator's hand around the time of the shooting, with one witness directly testifying that she observed the perpetrator standing next to the victim with his arm extended after gunshots went off. Notably, two individuals who had known defendant for nearly two decades identified him as the person wearing red and black shoes in the still image generated from the surveillance video and defendant, who was wearing the same clothing upon his arrest, also confirmed that he was the individual depicted therein during his police interview. The victim was found with a Hannaford bag on him after the shooting and defendant, without being prompted, informed police that he had been in an altercation with someone on the date in question who was carrying a Hannaford bag. He also made several other statements alluding to a shooting and claimed that his gun had been stolen. Although the verdict is premised solely upon circumstantial evidence, we are satisfied that the inference of defendant's guilt " 'is the only one that can fairly and reasonably be drawn from the facts, and that the evidence excludes beyond a reasonable doubt every reasonable hypothesis of innocence' " (People v Bohn, 242 AD3d at 1366, quoting People v Baque, 43 NY3d 26, 30 [2024]). Accordingly, we conclude that the verdict is supported by the weight of the evidence.
Contrary to defendant's contention, County Court properly denied his motion to suppress his inculpatory statements to law enforcement following his arrest. "When a defendant properly challenges statements made by him [or her] that the People intend to offer at trial, it is . . . the People's burden to establish, beyond a reasonable doubt, that such statements were voluntarily made" and are admissible (People v Witherspoon, 66 NY2d 973, 973-974 [1985] [citation omitted]; see People v Garrand, 189 AD3d 1763, 1767 [3d Dept 2020], lv denied 36 NY3d 1120 [2021]). In terms of admissibility, the constitutional [*7]privilege against self-incrimination "prohibits the People from using a statement made by a defendant during 'custodial interrogation' unless the prosecution can demonstrate use of the now-familiar Miranda warnings" (People v Robinson, ___ NY3d ___, ___, 2025 NY Slip Op 05871, *2 [2025], quoting Miranda v Arizona, 384 US 436, 444 [1966]), and that the defendant made a "knowing waiver of his or her Miranda rights" (People v Garrand, 189 AD3d at 1767 [internal quotation marks, brackets and citations omitted]). "[T]he term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response" (Rhode Island v Innis, 446 US 291, 301 [1980]). Correspondingly, where a defendant in custody makes incriminating statements spontaneously and not as a product of interrogative questioning, the statement is admissible at trial even if made prior to the administration of Miranda warnings (see People v Harrell, 59 NY2d 620, 621 [1983]; People v Kaye, 25 NY2d 139, 144 [1969]; People v Lilliard, 206 AD3d 1241, 1243 [3d Dept 2022]; People v Davis, 204 AD3d 1072, 1077 [3d Dept 2022], lv denied 38 NY3d 1032 [2022]; People v Ero, 139 AD3d 1248, 1249 [3d Dept 2016], lv denied 28 NY3d 929 [2016]).
During the Huntley hearing, a police detective who was involved in defendant's arrest testified that defendant was apprehended around 6:30 a.m. on March 23, 2021 while he was walking in a parking lot near a hotel in the Town of Fishkill. Defendant was placed in handcuffs at that time and escorted to an unmarked police vehicle for transport to the police station by the detective and another police officer. The detective who drove defendant to the police station testified at the hearing that he engaged in a casual conversation with defendant during the ride, discussing personal topics such as the fact that defendant was an "up and coming hip hop artist." The detective confirmed that defendant was not asked any questions about the shooting at this point and was told that any conversation about potential charges would be held at the police station in the City of Kingston. The detective testified that, at one point during the ride, defendant spontaneously stated that someone had stolen his gun. Upon arriving at the police station, defendant was escorted to an interview room, where his handcuffs were removed and he was read his Miranda rights. Defendant immediately asked for an attorney and the detective who read defendant his Miranda rights declined to engage in any questioning at that time. After defendant's attorney arrived, police questioned defendant about the shooting, eliciting additional inculpatory statements from him.
Here, County Court properly declined to suppress defendant's pre-Mirandized statement informing police that someone had "stole[n] [his] gun." Although defendant [*8]was in custody when he made this statement and had yet to receive Miranda warnings, the detective who drove defendant to the police station revealed that defendant made this statement spontaneously and not in response to any " 'express [police] questioning or its functional equivalent' " (People v Bryant, 59 NY2d 786, 788 [1983], quoting Rhode Island v Innis, 446 US at 300-301; accord People v Ashe, 208 AD3d 1500, 1505 [3d Dept 2022], lv denied 39 NY3d 961 [2022]). There was no evidence presented at the Huntley hearing to suggest that the officers who transported defendant to the police station engaged in any questioning that could be interpreted as an attempt at a custodial interrogation or that defendant made this statement as a result of an "external cause not generated by defendant himself" (People v Lilliard, 206 AD3d at 1243 [internal quotation marks and citations omitted]; see People v Davis, 204 AD3d at 1077; People v Ero, 139 AD3d at 1249). Deferring to the suppression court's credibility determinations and factual findings (see People v Prochilo, 41 NY2d 759, 761 [1977]; People v Meeks, 242 AD3d 1445, 1446 [3d Dept 2025]), we discern no basis upon which to disturb its determination that defendant's inculpatory statement while in the police vehicle was admissible as evidence at trial. The remainder of defendant's inculpatory statements at the police station were also properly found to be admissible, as they were made after defendant had received Miranda warnings, confirmed that he understood his rights by immediately requesting counsel, and waived his rights by "willingly discussing and answering questions" in counsel's presence (People v Lilliard, 206 AD3d at 1243 [internal quotation marks, brackets, and citation omitted]).
We also decline defendant's request to reduce the sentence in the interest of justice. Notwithstanding certain mitigating circumstances set forth in the presentence report, when considering all relevant circumstances, we do not find the sentence imposed to be unduly harsh or severe (see CPL 470.15 [b] [6]). Defendant's remaining contentions, to the extent not expressly addressed, have been considered and found lacking in merit.
Reynolds Fitzgerald, Lynch, Ceresia and Powers, JJ., concur.
ORDERED that the judgment is affirmed.

Footnotes

Footnote 1: Witness 5 acknowledged during the trial that she gave a police statement after the shooting in which she described that the perpetrator was wearing different clothing than the individual depicted in the surveillance footage from People's Exhibit 2. This statement initially led police to suspect another individual as the shooter.
Footnote 2: In the early morning hours of March 23, 2021, a surveillance camera at a Mobil convenience store in the Town of Fishkill captured footage of defendant, who was wearing the same black sweatshirt, gray pants, and red and black shoes enter the store with a surgical mask on.